UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re RIDGEMOUR MEYER PROPERTIES, LLC,

Debtor,

_____

RIDGEMOUR MEYER PROPERTIES, LLC,

Appellant,

-v.-

GOETZ FITZPATRICK, LLP

Appellee.

18 Civ. 5302 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

A real estate venture that failed in 2006 continues to spawn litigation — in New York State courts, in federal bankruptcy court, and now in this Court. At its core, the instant appeal concerns the harmonization of two seemingly contradictory judicial findings: *first*, a finding by United States Bankruptcy Judge Stuart M. Bernstein in 2008 that Debtor Ridgemour Meyer Properties, LLC ("Debtor," "Ridgemour," or "RMP") had engaged in deceptive conduct with its attorneys, Goetz Fitzpatrick LLP ("GF"), which finding was instrumental to the dismissal of a later state-court malpractice action brought by RMP against GF; and *second*, Judge Bernstein's more recent opinion that GF was entitled to recover most, though not all, of the attorneys' fees it had billed to RMP. RMP protests that the same *in pari delicto* defense that brought about the demise of its malpractice lawsuit against GF compels the denial of GF's claim for fees. GF responds that Judge Bernstein was correct in

determining that the doctrine of *in pari delicto* did not bar recovery for the entirety of the fees billed, but only for that portion that was incurred after GF was found to have engaged in joint misconduct with RMP.  For the reasons set forth in the remainder of this Opinion, the Court affirms the decision of Judge Bernstein.

**BACKGROUND**[1]

**A.      The Parties and the Joint Venture**

The parties are largely in agreement concerning the underlying real estate transaction.  The Court therefore adopts Judge Bernstein's summary so that it may focus greater attention on the procedural history that ensued:

---

[1]      The facts of the dispute are presented in greater detail in several opinions from related civil actions, and this Court refers to them using Judge Bernstein's citing conventions: *In re Ridgemour Meyer Props., LLC*, 413 B.R. 101 (Bankr. S.D.N.Y. 2008) ("*Ridgemour I*"); *Metro. Plaza WP, LLC* v. *Goetz Fitzpatrick, LLP*, Index No. 115519/2009, 2013 N.Y. Slip Op. 32368(U), 2013 WL 5574533 (Sup. Ct. N.Y. Cty. Oct. 7, 2013) ("*Ridgemour II*"), *aff'd*, 3 N.Y.S.3d 595 (1st Dep't), *leave to appeal denied*, 26 N.Y.3d 912 (2015); and *In re Ridgemour Meyer Props., LLC*, No. 08-13153 (SMB), 2016 WL 5395836 (Bankr. S.D.N.Y. Sept. 27, 2016) ("*Ridgemour III*").  The opinion from which the instant appeal is taken, *In re Ridgemour Meyer Props., LLC*, No. 08-13153 (SMB), 2018 WL 2305765 (Bankr. S.D.N.Y. May 18, 2018), is referred to here as "*Ridgemour IV*."

This Opinion makes numerous citations to materials found in the dockets of this Court and the Bankruptcy Court.  Citations to the Bankruptcy Court's docket are presented using the convention "Bankr. Dkt. #[docket entry]," while citations to this Court's docket are presented using the convention "Dkt. #[docket entry]."  At RMP's request, the Court also takes judicial notice of the record on appeal to the Appellate Division, First Department, in the case captioned *Metropolitan Plaza WP, LLC* v. *Goetz Fitzpatrick, LLP*, Index No. 115519/2009.  *See Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice [of public records], it does so in order 'to determine what statements [they] contained' — but 'again not for the truth of the matters asserted.'" (internal citations omitted) (second alteration in original)).  Materials in the appellate record are referred to using the convention "AR."

For ease of reference, Debtor RMP's brief on appeal is referred to as "RMP Br." (Dkt. #10); Claimant GF's brief on appeal as "GF Opp." (Dkt. #12); and Debtor RMP's reply brief as "RMP Reply" (Dkt. #13).  Also for ease of reference, certain legal terms, including *in pari delicto* and *res judicata*, are presented in italics in this Opinion even if not italicized in the materials from which the Court cites.

Ridgemour is a New York limited liability company whose members are owned and controlled by William Meyer ("Meyer") and A.J. Rotonde ("Rotonde"). In 2003, Ridgemour and Ginsburg Development Companies, LLC ("GDC") formed a joint venture, known as Pinnacle-Westchester LLC ("Pinnacle"), to develop and erect a high rise building in White Plains, New York. Ridgemour contributed a parcel of real property known as the "Primary Lot" which was subject to a mortgage in the approximate amount of $3,386,000 held by Merida Associates, Inc. ("Merida") and contract rights to purchase two other lots. Ridgemour subsequently sold another lot (the "Jomas Lot") to Pinnacle. Unless otherwise indicated, Property refers to all of the Pinnacle real property that originated with Ridgemour.

By 2006, if not sooner, Ridgemour and GDC became deadlocked over the future of Pinnacle. Ridgemour still hoped to develop the project while GDC sought to dissolve the joint venture. On November 22, 2006, GDC commenced an arbitration against Ridgemour, Meyer and Rotonde (the "Arbitration"). Ridgemour originally hired a different firm to represent its interests, but eventually retained GF. Donald Carbone, Esq., a GF partner, was in charge of the legal work performed by GF on behalf of Ridgemour.

*Ridgemour IV*, 2018 WL 2305765, at *1-2.

## B.    The Arbitration and the Misconduct

On or about November 22, 2006, GDC commenced an arbitration in accordance with the Pinnacle Operating Agreement against RMP, Meyer, and Rotonde. Proceedings were conducted before Arbitrator Thomas Scarola (the "Arbitrator"). On June 18, 2008, after several days of evidentiary hearings, the Arbitrator sent an email to the parties (the "June 18 Email"), which, among

other things, offered the Arbitrator's conclusion that Pinnacle should be dissolved:

> [The June 18 Email] stated, among other things: RMP incurred damages due to GDC's management of Pinnacle; control of the Property should be returned to RMP to allow for its development; and the parties should be prepared to discuss the methods of dissolving Pinnacle. The email also stated that the foregoing would not preclude assigning a value to the Property contributed by RMP and compensating GDC for its investment, with such issues to be determined after hearing the parties' damage claims and defenses.

*Ridgemour II*, 2013 WL 5574533, at *2; *see also Ridgemour IV*, 2018 WL 2305765, at *2 ("Ridgemour was 'elated' and 'delighted' with the Arbitrator's ruling directing return of the Property back to Ridgemour." (citing exhibits)).

The parties met with the Arbitrator the next day, June 19, 2008, during which time they discussed the transfer of control of the Property back to RMP, and the concomitant protection of GDC's rights through a mortgage and note. *See Ridgemour II*, 2013 WL 5574533, at *2; *Ridgemour I,* 413 B.R. at 104-05. That afternoon, the parties advised the Arbitrator of an agreement in principle on the remaining issues. They then set out to draft the settlement documents, which included draft deeds that reconveyed the property from Pinnacle to RMP, as well as a mortgage, a note, and an indemnity agreement in favor of GDC.[2]

Here began the mischief that has prompted so much litigation. The parties reached an impasse concerning the settlement documents, and while

---

[2]    *See generally Ridgemour II*, 2013 WL 5574533, at *2:

> Thereafter, the parties discussed the issues regarding the transfer of control of the Property to RMP, and the protection of GDC's rights through a mortgage and a note of $14.629 million, with the

certain documents (such as the deeds reconveying the Property back to RMP) had been deemed acceptable to both sides, the parties contemplated that all documents would be executed simultaneously at the time of the closing. *See Ridgemour I,* 413 B.R. at 105 ("The transmittal email advised Carbone that the documents were being sent prior to GDC's review to expedite the matter, and '[a]ccordingly, the documents remain subject to our client's further review, comment and approval.'" (record citation omitted)). In clear derogation of this understanding, on or about June 30, 2008, A.J. Rotonde of RMP signed the deeds and delivered them to a real estate attorney, Carol Dall, for recordation. Dall retained the documents in her possession for several weeks, before delivering them to the Westchester County Clerk on July 21, 2008, who then recorded the deeds on July 29, 2008. *See id.* at 107; *Ridgemour IV*, 2018 WL 2305765, at *2.

Unaware of Rotonde's conduct — and, more broadly, of the deception being perpetrated by RMP and, later, RMP's counsel — the Arbitrator issued an interim award (the "Interim Award") dated July 9, 2008:

> The Interim Award provided, in pertinent part, that [i] Pinnacle would be dissolved, [ii] ownership of the Property would be transferred from Pinnacle to the debtor [RMP], [iii] the debtor would execute a note and mortgage in GDC's favor in the sum of $14.629 million to secure the repayment of monies that GDC had invested or expended on behalf of Pinnacle, [iv] the amount of the note and mortgage could increase or

---

understanding that the amount could rise or fall depending on the resolution of their claims and defenses. GDC's attorneys volunteered to draft the mortgages and other conveyance documents, and RMP's attorneys volunteered to draft the deeds for the Property.

decrease based on the disposition of the debtor's damage claims, and [v] the debtor would indemnify Pinnacle, GDC and Ginsburg from any liability arising from its efforts to develop the Property after the date of the transfer or arising from the debtor's actions prior to the date of the transfer. Each component was contained in a separate paragraph.

*Ridgemour I*, 413 B.R. at 105; *see also Ridgemour II*, 2013 WL 5574533, at \*2-3. However, drafting difficulties still plagued the parties throughout June and July 2008, prompting them to seek assistance from the Arbitrator several times to resolve their disputes. During all of these communications, GF attorney Donald Carbone failed to advise GDC or the Arbitrator that the deeds had been executed and transferred to RMP's real estate counsel for recordation. *See, e.g.*, *Ridgemour I,* 413 B.R. at 105-06 (discussing June 28, 2008 email from Arbitrator to parties discussing issues of ownership and control of the Property); *id.* at 106 (discussing July 3, 2008 email from Carbone complaining that GDC was attempting "to delay the transfer of the property to RMP"); *see generally id.* ("Both sides viewed the conveyance of the Property as something that had not yet occurred, and depended on the delivery of the mortgages and other documents.").

On July 31, 2008, two days after the recordation, counsel for GDC learned that Rotonde and RMP had recorded the deeds, thereby reconveying the property back to RMP without any corresponding protections for GDC. Counsel for GDC immediately advised the Arbitrator, prompting Carbone to proffer the not-at-all-convincing response that such conduct was entirely in accord with the parties' jointly-held understanding. *See Ridgemour I,* 413 B.R.

at 107. The Arbitrator dismissed Carbone's efforts at placation, and instead imposed the following deadlines: "After resolving the disputed mortgage and other terms, the [A]rbitrator directed GDC to modify the documents by August 6th, and gave [RMP] until August 12th to return the signed documents and produce a letter of credit." *Id.*

## C.     The Bankruptcy Petition and the Appointment of a Trustee

RMP did not abide by the Arbitrator's deadline, but instead filed a petition under Chapter 11 of the Bankruptcy Code late in the evening of August 11, 2008. (Bankr. Dkt. #1).[3] On August 25, 2008, GDC filed a motion to dismiss RMP's petition or to appoint a Chapter 11 trustee (Bankr. Dkt. #8), and the following day it filed a motion for sanctions against RMP and GF (Bankr. Dkt. #13-14). Judge Bernstein held a hearing on these and other matters on September 23, 2008. (Bankr. Dkt. #36 (transcript)). Thereafter, RMP changed counsel, and new counsel offered to dismiss the petition and reconvey the property back to Pinnacle. (Bankr. Dkt. #37-41). GDC refused the offer unless its attorneys' fees were reimbursed by RMP, and modified its motion to seek only the appointment of a Chapter 11 trustee. (Bankr. Dkt. #44).[4]

---

[3]     Three days earlier, on August 8, 2008, GDC had filed a notice of pendency against the Property and commenced an action against RMP, Meyer, and Rotonde in Westchester County Supreme Court. *See Ginsburg Dev. Cos., LLC* v. *Donald Carbone and Goetz Fitzpatrick, LLP*, Index No. 17369/2008 (Sup. Ct. Westchester Cty.) (the "Westchester Action").

[4]     Of later significance to this appeal, GF filed a proof of claim in the amount of $350,555.49 as an unsecured creditor. At times, GF's claim is referred to in the record or in the parties' briefs as the "Claim" or "Claim No. 5."

Judge Bernstein refused RMP's request to dismiss the petition, and held an additional two days of hearings on GDC's motion for a trustee. (Bankr. Dkt. #54-55 (transcripts of hearings on October 14 and 27, 2008)). On November 12, 2008, the Bankruptcy Court granted GDC's modified motion, finding that, "GDC demonstrated by clear and convincing evidence that the debtor, its principals and its attorneys acted dishonestly when they secretly transferred the Property from Pinnacle to the debtor, and then hid what they had done from GDC and the arbitrator." *Ridgemour I,* 413 B.R. at 108; *see also id.* at 112 (summarizing deceptive conduct).

As suggested by the above-quoted language, Judge Bernstein examined both the conveyance and the cover-up. As to the former, he found that:

- "Rotonde and Carbone knew that nothing that occurred on June 18th or June 19th authorized Rotonde to sign the deeds on behalf of Pinnacle and record them for the benefit of the debtor."

- "Carbone's contrary testimony [to the Bankruptcy Court] was incredible," inasmuch as it was negated by his contemporaneous communications with GDC and the Arbitrator.

- "Recognizing the limits of the [June 18] Email and the June 19th hearing, the debtor's professionals hatched a scheme — they would rely on an ambiguous award, then under negotiation but not yet signed, to justify the transfer of the Property."

- "Carbone testified, with some self-satisfaction, that he purposely drafted the Interim Award not to expressly require the simultaneous execution of the documents." However, the Bankruptcy Court found, his "maneuver was ineffective to memorialize rulings that Carbone knew the arbitrator never made."

*Ridgemour I,* 413 B.R. at 109-10.

Judge Bernstein found the "more troublesome aspect of this case" to be "the secrecy and lack of candor shown by the debtor and its professionals." *Ridgemour I,* 413 B.R. at 110. Not only did Rotonde — ostensibly a fiduciary of RMP — and his attorneys prepare to file and then file the deeds without telling GDC, but they "created the opposite impression" in their communications with the Arbitrator and GDC's counsel. *Id.*; *see also id.* at 111 ("The circumstances suggest that the debtor was not as confident about its interpretation of the Interim Award as it was at trial, and acted out of concern that the arbitrator might change his ruling or impose new requirements during the conference call. In any event, the debtor never satisfactorily explained the delay in recordation in light of the supposed urgency."). Worse yet, once their deceit was revealed, RMP and its counsel pretended to comply with arbitral deadlines while preparing the Chapter 11 petition. Given Rotonde's misconduct — which occurred in spite of his fiduciary obligations to Pinnacle and GDC — Judge Bernstein found that appointment of a Chapter 11 trustee was warranted. *See id.* at 112-15. (*See also* Bankr. Dkt. #57 (order granting application to appoint trustee)).[5]

After Kenneth P. Silverman was appointed as Trustee, GDC initiated several adversary proceedings, including proceedings against RMP and a related entity, Merida Associates, Inc. ("Merida").[6] (*See* Bankr. Dkt. #59, 62;

---

[5]     RMP appealed from Judge Bernstein's decision to appoint a trustee, but later withdrew the appeal. (Bankr. Dkt. #60-61, 81).

[6]     GF's legal services provided in connection with Merida are discussed *infra.*

*see also* Bankr. Dkt. #94, 104 (transfer of cases from District Court to Bankruptcy Court)).  On December 10, 2008, Judge Bernstein denied GDC's motion for sanctions.  (Bankr. Dkt. #71).[7]

Ultimately, on October 5, 2009, the Bankruptcy Court confirmed a plan proposed by Meyer, Rotonde, WPD Development Corporation ("WPD"), and W&A Development, LLC (collectively, the "Plan Proponents").  In relevant part, the Plan provided that a class of unsecured creditors would receive 100% of the allowed amount of their claims plus post-petition interest at the annual rate of 2.22% until paid.  (Bankr. Dkt. #220, 246).  Determination of certain unsecured claims, including the one filed by GF, was deferred to another day. (*See id.*; *see also* Bankr. Dkt. #259).

## D.    The Westchester Action

As noted, GDC had filed the Westchester Action in August 2008.  Two months later, on October 29, 2008, GDC amended its complaint to include Carbone and GF as defendants.  On November 10, 2008, the action was removed to this District, *see Ginsburg Dev. Cos., LLC* v. *Ridgemour Meyer Prop., LLC*, No. 08 Civ. 9682 (BSJ), and on January 15, 2009, it was transferred to the Bankruptcy Court as an adversary proceeding.  (*See* Bankr. Dkt. #94).

On September 24, 2009, as part of RMP's Plan, a settlement was entered into between and among GDC and its principal, the Trustee, Meyer, Rotonde,

---

[7]    GDC appealed from the order denying sanctions, and the order was affirmed by a sister court in this District.  *See In re Ridgemour Meyer Properties, LLC*, No. 09 Civ. 3765 (JGK), 2011 WL 135834, at *1 (S.D.N.Y. Jan. 7, 2011).

and others, pursuant to which GDC would receive $5.7 million in exchange for relinquishing all rights and interests to the Property. (Bankr. Dkt. #239). In the settlement stipulation, the parties exchanged mutual releases of all claims asserted in the arbitration and related state court actions, *except that* GDC and its principal specifically did not release any claims they might have against GF and Carbone. (*Id.*). By minute entry dated November 13, 2009, the adversary proceeding was closed. (*See* Bankr. Dkt., Entry of Nov. 13, 2009)).

The matter was transferred back to Westchester County Supreme Court, where GDC continued to litigate against GF and Carbone. The two defendants moved to dismiss; by order entered February 19, 2010, the trial court granted in part and denied in part their motion. *See Ginsburg Dev. Cos., LLC* v. *Carbone*, No. 17369/08, 2010 WL 3253668 (Sup. Ct. Westchester Cty. Feb. 19, 2010); *see also Ginsburg Dev. Cos., LLC* v. *Carbone*, No. 17369/08, 2010 WL 3073781 (Sup. Ct. Westchester Cty. May 17, 2010) (denying motion for reargument). The parties cross-appealed to the Appellate Division, Second Department, which affirmed the trial court's refusal to dismiss the causes of action based in fraud, violations of N.Y. Jud. Law § 487,[8] aiding and abetting a

---

[8]     Section 487 provides both civil and criminal causes of action, and reads:

> An attorney or counselor who:
>
> 1.  Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or,
>
> 2.  Wilfully delays his client's suit with a view to his own gain; or, wilfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for,
>
> Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

breach of fiduciary duty, and aiding and abetting fraud, and reversed the trial court's dismissal of the claim for legal malpractice. *See Ginsburg Dev. Cos., LLC* v. *Carbone*, 85 A.D.3d 1110, 1111-12 (2d Dep't 2011) ("Although the second amended complaint does not allege an attorney-client relationship between the plaintiff and the defendants, the allegations in the second amended complaint 'fall within the narrow exception of fraud, collusion, malicious acts or other special circumstances under which a cause of action alleging attorney malpractice may be asserted absent a showing of actual or near-privity.'" (internal citation omitted)).

In 2013, at the conclusion of discovery, GF and Carbone moved for summary judgment. The Westchester trial court again granted the motion in part and denied it in part and the parties again cross-appealed. *See Ginsburg Dev. Cos., LLC* v. *Carbone*, 134 A.D.3d 890 (2d Dep't 2015). This time, the Second Department affirmed the trial court's grant of summary judgment as to GDC's claims of fraud, aiding and abetting fraud, and negligent misrepresentation, and affirmed its denial of summary judgment as to GDC's claims for legal malpractice, violation of N.Y. Jud. Law § 487, and aiding and abetting breach of fiduciary duty.

The Court has reviewed the docket sheet for the Westchester Action, and understands that the matter settled during a trial held in April 2016. The

---

N.Y. Jud. Law § 487.

terms of the settlement are not publicly available, and are not relevant to the instant appeal.

**E.    The Malpractice Action and the Claim Objection**

As the Bankruptcy Court observed, "[t]he [Plan] confirmation did not resolve the issues between the parties." *Ridgemour IV*, 2018 WL 2305765, at *4. One month after the Plan was confirmed, on or about November 3, 2009, RMP, Ridgemour Development Corporation, and certain of the Plan Proponents (collectively, the "State Court Plaintiffs") filed an action in New York County Supreme Court (the "Malpractice Action") against GF and Carbone (collectively, the "State Court Defendants"). *See Metro. Plaza WP, LLC* v. *Goetz Fitzpatrick, LLP*, Index No. 115519/2009 (Sup. Ct. N.Y. Cty.), Opinion and Order Filed Sept. 2, 2010 (the "*Malpractice Action MTD Opinion*").[9] The complaint (the "Malpractice Complaint" or "Mal. Compl." (Bankr. Dkt. #302-6)) recited causes of action for violations of N.Y. Jud. Law § 487, legal malpractice, breach of fiduciary duty, and breach of contract.

Because of its potential significance to the instant appeal, the Court pauses to discuss the specifics of the Malpractice Complaint, which was predicated to a degree on Judge Bernstein's factual findings in *Ridgemour I.* As alleged by the State Court Plaintiffs, the State Court Defendants' malfeasance and nonfeasance did not occur at the start of the representation, but rather began after certain rulings of the Arbitrator. (*See* Mal. Compl. ¶¶ 9-10

---

[9]    The Court was able to locate a copy of the slip opinion, but was not able to find a version of the opinion online. It therefore cites to the pages of the slip opinion.

(summarizing misconduct as (i) "intentionally deceiving or attempting to deceive American Arbitration Association arbitrator Thomas Scarola and the United States Bankruptcy Court for the Southern District of New York and the parties to a bankruptcy proceeding involving the underlying real estate matters," (ii) "overlooking or ignoring remedies available to them under Rule 46 of the American Arbitration Association," (iii) "publicly abandon[ing] plaintiffs at or around the time of their bankruptcy filing," and (iv) engaging in the misconduct identified by the Bankruptcy Court in *Ridgemour I*); *see also id.* at ¶ 21 (explaining that "certain rulings were eventually issued by [the Arbitrator] in June, July and August 2008 precipitating the conduct giving rise to plaintiffs' claims in this action"), ¶ 27 (identifying first actionable conduct as alleged failure by the State Court Defendants to provide proper legal advice in response to Arbitrator's rulings of June 18 and 28, 2008), ¶¶ 35-36 (alleging misconduct in Carbone's failure to advise GDC of the recordation of the deeds in late July 2008), ¶ 44 (alleging misconduct in Carbone's failure to meet with RMP's bankruptcy counsel before his testimony in Bankruptcy Court)).

Among the causes of action in the Malpractice Complaint, the State Court Plaintiffs raised a claim of malpractice based principally, although not exclusively, on "[t]he misconduct that the Bankruptcy Court found defendants to have engaged in."  (Mal. Compl. ¶ 63).  They similarly raised a claim for breach of contract, i.e., the retainer agreement, that was sourced to the State Court Defendants' "legal representation of Plaintiffs, and inter alia, failures as

set forth above in [GF's] dealings with the [Bankruptcy] Court, as more fully set forth in [*Ridgemour I*]." (*Id.* at ¶ 79).

The Malpractice Action had repercussions for the Plan confirmation. In accordance with the Plan, RMP and the Plan Proponents had filed an objection (the "Objection") to GF's previously-filed proof of claim for $350,555.49 on November 4, 2009, one day after commencing the Malpractice Action. (Bankr. Dkt. #259). The Objection sought disallowance of all post-petition invoices submitted by GF, while requesting that all pre-petition invoices be held in abeyance pending the resolution of the Malpractice Action. (*See id.* at 4-5; *see also id.* at 6 (explaining that the claims in the Malpractice Action "are based on defendant Carbone's pre-Petition actions and legal advice to Proponents and the Debtor, and in part upon this Court's findings with respect to those actions, set forth in [*Ridgemour I*]").

On January 13, 2010, the affected parties stipulated in the Bankruptcy Court that GF's claim would be reduced by $40,451.28, which amount represented post-petition services, and further agreed to adjourn resolution of the Objection until after the Malpractice Action had been concluded. (Bankr. Dkt. #271). The Plan Proponents filed a bond and undertaking in the principal sum of $365,000, to ensure payment of GF's claim in the event the Plan Proponents failed to make the payment themselves. (Bankr. Dkt. #260). The Bankruptcy Court endorsed the stipulation on January 15, 2010, and closed the case while retaining jurisdiction over the Objection. (Bankr. Dkt. #272).

At this point, the proceedings shifted to New York County Supreme Court. The State Court Defendants moved to dismiss the Malpractice Complaint in lieu of filing an answer, on a theory of law of the case. *See Malpractice Action MTD Opinion* at 7 ("Defendants specifically contend that, because all of plaintiffs' causes of action are predicated on the erroneous assertion that the findings in the bankruptcy decision also constitute the law of the case in this action, the documentary evidence herein (i.e., the complaint itself) establishes that those causes of action lack merit.")). In a decision dated August 27, 2010, and issued on September 2, 2010, the trial court denied the motion in full. *See id.* at 14-15.

In late 2012, at the close of discovery, the parties cross-moved for summary judgment. More particularly, the State Court Plaintiffs moved for partial summary judgment on the issue of liability, while the State Court Defendants moved for summary judgment as to all claims. In connection with these motions, the State Court Defendants did not accept or concede the correctness of Judge Bernstein's findings, nor did they assume the mantle of wrongdoer in the Arbitration or the bankruptcy proceedings. Instead, they argued that accepting the Bankruptcy Court's findings as true meant accepting the Bankruptcy Court's enumeration of the State Court Plaintiffs' misconduct — and thus, to the extent the State Court Plaintiffs were relying on the Bankruptcy Court's findings, the misconduct found was misconduct in which Plaintiffs were *in pari delicto*. (*See, e.g.*, AR 322 (referring to Rotonde as "plotter in chief," and Dall as "chief implementer"), 326 (contending that the

16

cover-up identified by the Bankruptcy Court was "solely traceable to Rotonde");
*see also id.* at 340-41, 1298-1306).

In an opinion dated September 30, 2013, and filed on October 7, 2013,
the trial court granted the motion of the State Court Defendants. *See
Ridgemour II*, 2013 WL 5574533. (Bankr. Dkt. #338-3). As the trial court
observed, both sides sought to impute preclusive effect to the Bankruptcy
Court's 2008 decision appointing a Chapter 11 trustee. The State Court
Plaintiffs sought summary judgment against their former attorneys on the
issue of liability, citing Judge Bernstein's decision; the State Court Defendants
agreed that collateral estoppel was appropriate, but argued that such estoppel
would encompass as well Judge Bernstein's findings of misconduct on the part
of two of the State Court Plaintiffs, RMP and Rotonde. *See Ridgemour II*, 2013
WL 5574533, at *6-7.

Quoting at length from the Bankruptcy Court's decision, the trial court
agreed with the State Court Defendants:

> Based on the foregoing, despite Plaintiffs' contention to
> the contrary, they (including RMP, RDC and Rotonde),
> as well as Defendants (who now reluctantly
> acknowledge wrongdoing on their part), were both
> found to have acted dishonestly in connection with the
> Property transfer and the subsequent coverup. These
> findings were the primary reason that resulted in the
> appointment of an independent trustee. As urged by
> Defendants, because Plaintiffs were parties in the
> Chapter 11 case and had a full and fair opportunity to
> argue their case, the findings and rulings against them
> by the Bankruptcy Court must be given collateral
> estoppel effect. This court agrees. Because both parties
> were wrongdoers, they were *in pari delicto*.

*Ridgemour II*, 2013 WL 5574533, at \*7.  In so finding, the trial court rejected

Rotonde's arguments that any misconduct was the product of his counsel's

advice:  "[H]is assertion is neither supported nor corroborated by documentary

or other evidence.  On the other hand, there is ample circumstantial evidence

which shows that Rotonde and Carbone were participants in the fraudulent

scheme."  *Id.* at \*8 (citing various emails); *see also id.* at \*10 ("The foregoing

shows, at least inferentially, that Rotonde was the one who made the ultimate

decision as to whether RMP should file for bankruptcy relief.").

Alternatively, the State Court Plaintiffs asked the trial court to give

preclusive effect to certain court rulings in the Westchester Action.  *See*

*Ridgemour II*, 2013 WL 5574533, at \*10.  The trial court demurred, noting that

the Westchester court's denial of GF's motion for summary judgment on the

claim of aiding and abetting a fiduciary duty only made sense if the State Court

Plaintiffs were "the primary violator[s]."  *Id.*  And finally, although something of

a nullity, the trial court denied the State Court Plaintiffs' correlative motion for

partial summary judgment, finding that issues of fact existed regarding

"whether Defendants breached their fiduciary duty or that they were the sole

cause of Plaintiffs' alleged loss."  *Id.*

A motion for reargument was denied.  *See Metro. Plaza WP, LLC* v. *Goetz*

*Fitzpatrick, LLP*, No. 115519/2009, 2014 WL 10698465 (Sup. Ct. N.Y. Cty.

Dec. 17, 2014).  The State Court Plaintiffs appealed the grant of summary

judgment to the First Department, which affirmed the trial court's decision in a

short order issued in March 2015.  *See Metro. Plaza WP, LLC* v. *Goetz*

*Fitzpatrick, LLP*, 3 N.Y.S.3d 595 (1st Dep't 2015) ("The motion court correctly gave collateral estoppel effect to the rulings of the bankruptcy court in a prior proceeding finding deceit and other misconduct by plaintiffs, as well as defendants, and dismissed the complaint pursuant to the doctrine of *in pari delicto*." (internal citation omitted)). The Court of Appeals denied leave to appeal in November 2015. *See Metro. Plaza WP, LLC* v. *Goetz Fitzpatrick, LLP*, 26 N.Y.3d 912 (2015).

## F. The Reopening of the Chapter 11 Proceeding

### 1. The Motion to Direct Payment of Claim

In May 2016, GF moved to reopen RMP's Chapter 11 case in order to resolve its outstanding claim for legal fees. (Bankr. Dkt. #302; *see also* Bankr. Dkt. #309 (order granting motion to reopen)). Again the parties debated issues of preclusion. This time, GF argued "that the Plan Proponents [we]re barred from further challenging the allowed amount of the GF Claim under the doctrine of *res judicata*." (Bankr. Dkt. #302-1 at 7). RMP and the Plan Proponents countered that "*res judicata* actually cuts *against* allowance of the Claim," since GF could have, but elected not to, bring a counterclaim for legal fees. (Bankr. Dkt. #306 at 4). The Bankruptcy Court rejected both sides' arguments, finding that (i) GF had not been obligated to interpose a counterclaim for its legal fees in the Malpractice Action, but (ii) *res judicata* did not entitle GF to the allowance and immediate payment of its claim, inasmuch as the Bankruptcy Court was entrusted with "exclusive jurisdiction to determine the allowance of claims, even those that have been reduced to

judgment, and *res judicata* does not bar that determination." *Ridgemour III*, 2016 WL 5395836, at *5.

## 2. The Pretrial Conferences Addressing the Claim and Its Objection

The Bankruptcy Court recounts — and this Court's review of the record below confirms — that "[w]hat followed was a series of conferences, hearings and motions during which [RMP's] theory of the Claim Objection, and specifically, the extent to which the doctrine of *in pari delicto* applied to defeat the Claim, changed with dizzying frequency." *Ridgemour IV*, 2018 WL 2305765, at *5-6 (outlining changes in position). As but one example, counsel for RMP maintained in November 2016 that GF was entitled to all but approximately $43,000 of its claimed fees (Bankr. Dkt. #312 at 4-6); six months later, RMP moved for disallowance of the entire amount (*see* Bankr. Dkt. #318, 321 (motion to disallow claim and its opposition); Bankr. Dkt. #325 (order denying motion to disallow claim)). (*See also* GF Opp. 2-3 (listing instances in which RMP acknowledged that GF and Carbone had committed no bad act before July 30, 2008)).[10]

---

[10] This Court also agrees with the Bankruptcy Court's analysis of certain statements made by RMP's counsel at the November 1, 2016 hearing and thereafter, as well as its conclusion that the gloss that counsel sought to put on his November 1 statements "is disingenuous to the point of frivolous." *Ridgemour IV*, 2018 WL 2305765, at *5 n.3. In addition to the statements on which the Bankruptcy Court focused, where RMP's counsel confirmed that RMP was only contesting approximately $43,000 in fees, counsel also argued that *in pari delicto* did not operate to bar all legal fees, and that GF was entitled to fees incurred "before this what we allege is dishonest conduct began." (Bankr. Dkt. #404-4 at 2-3; *see also id.* at 4 ("I'm assuming that because the state court didn't get to the facts of the matter, but said *in pari delicto* and collateral estoppel forecloses us after the fact, Your Honor wrote a decision that said at some point in time, dishonest conduct began and shows our opinion that that dishonest conduct began with the filing of the deed[.]")).

On March 23, 2017, the parties filed their joint pretrial order. (Bankr. Dkt. #317). The submission clarified that RMP was seeking "to challenge the reasonableness of the amount of GF's fees and expenses and to reduce the amount of the GF claim." (*Id.* at 2). The parties also articulated their respective views as to GF's entitlement to fees for work it had performed for RMP and Meyer in connection with a lawsuit brought by Merida, which held a mortgage and note on one of the properties that had been transferred to Pinnacle early on in the joint venture. GF argued that it was entitled to the fees, while RMP contended that no fees were warranted because, among other reasons, no engagement letter had been signed. (*See id.* at 10-11, 15, 19).

RMP moved for disallowance of the claim on May 15, 2017, which motion was denied from the bench by the Bankruptcy Court on June 1, 2017. (Bankr. Dkt. #325 (order)). Trial on the claim was then scheduled. (Bankr. Dkt. #326). In preparation for the trial, GF moved *in limine* to ban or limit RMP's use of the *in pari delicto* defense. (Bankr. Dkt. #327; *see also* Bankr. Dkt. #334 (RMP's cross-motion *in limine* to ban testimony or other evidence of GF's billings)). At a hearing on July 13, 2017, the Bankruptcy Court discussed with the parties whether the *in pari delicto* defense operated in a binary fashion (that is, as a full bar to any fees that GF had incurred in representing RMP) or whether GF could still recover for reasonable and necessary expenses that it performed before any wrongful conduct. (*See* Bankr. Dkt. #340 (transcript) at 6-14).[11]

---

[11] The "reasonable and necessary" standard to which the parties referred derives from (i) 11 U.S.C. § 330(a)(1), which permits "reasonable compensation for actual, necessary services" and the reimbursement of "actual, necessary expenses," and (ii) 11 U.S.C.

While Judge Bernstein reserved decision on the issue until trial, he expressed

his tentative agreement with the following assessment from GF's counsel:

> [T]here's a general premise within the *in pari delicto* doctrine itself that says it only applies to conduct directly related to the immoral conduct. ... So taking that aspect of the law and applying it to your hypothetical scenario, anything that was done before our failure to disclose, which is what you found to be wrong and unconscionable, as long as it was reasonably performed, which is certainly clearly the right of the debtor to object, and beneficial to the debtor — which it was; it produced monumental success — then those fees are compensable under this general premise of the *in pari delicto* doctrine.
>
> If it benefitted the debtor, then it's compensable. It may not be compensable for other reasons like reasonableness or some other claims, and we're not asking the Court to consider that now. We're asking the Court to consider that at the evidentiary hearing. But insofar as it concerns *in pari delicto*, that is not a bar to that which was performed ... adequately and successfully.

(*Id.* at 12-13).

### 3. The Evidentiary Hearing in the Bankruptcy Court

The first two days of the trial on GF's claim were held on August 8 and 9,

2017. (Bankr. Dkt. #347-48 (transcripts)). At the outset, GF clarified that its

revised claim had been reduced "to eliminate post-petition fees in the sum of

$40,451.28, leaving a net stipulated amount of $310,104.21." (Bankr. Dkt.

#347 at 5). William Meyer, a principal of RMP, testified for Debtor, while

---

§ 504(b)(2), which permits claims "for services of an insider or attorney of the debtor, [unless] such claim exceeds the reasonable value of such services." *See generally Zeisler & Zeisler, P.C.* v. *Prudential Ins. Co. of Am. (In re JLM)*, 210 B.R. 19, 23 (2d Cir. BAP 1997); *Ridgemour IV*, 2018 WL 2305765, at *12-14.

Donald Carbone testified for GF. In addition, the Bankruptcy Court admitted numerous exhibits, including declarations, billing documentation, written objections, emails, and the retainer agreement between the parties. (*See* Bankr. Dkt. #347-48).

The Court adjourned the trial for several weeks to accommodate its calendar. During the interim, GF filed a motion for judgment in its favor on partial findings pursuant to Fed. R. Bankr. P. 7052 (*see* Bankr. Dkt. #349, 352, 356 (parties' submissions)), which motion was heard on September 28, 2017 (Bankr. Dkt. #363 (transcript)). At the conclusion of the hearing, Judge Bernstein denied the motion. (Bankr. Dkt. #358 (order denying motion)).

Trial resumed on October 4, 2017, with testimony from Heidi Brown, a member of RMP, and Ellen August, a GF non-equity partner. (Bankr. Dkt. #364 (transcript)). And on December 11, 2017, additional testimony was taken from Ms. August and from RMP principal A.J. Rotonde. (Bankr. Dkt. #359 (transcript)). Additional exhibits were also introduced during these two trial days.

GF submitted its Proposed Findings of Fact and Conclusions of Law on February 9, 2018 (Bankr. Dkt. #371); RMP submitted its Proposed Findings of Fact and Conclusions of Law on March 5, 2018 (Bankr. Dkt. #376); and GF submitted its Corrected Reply Conclusions of Law on March 26, 2018 (Bankr. Dkt. #385).

**4.    The Bankruptcy Court's Findings of Fact and Conclusions of Law**

The Bankruptcy Court issued its 48-page Post-Trial Findings of Fact and Conclusions of Law Regarding Claim No. 5 on May 18, 2018.  (Bankr. Dkt. #394).  *Ridgemour IV*, 2018 WL 2305765.  It began with a detailed summary of the factual and procedural histories of the case, drawing from its own and several New York State court opinions, and adding to those opinions a summary of events since the reopening of the bankruptcy case.  *Id.* at *1-6.  It then made certain preliminary factual findings concerning (i) the Merida litigation; (ii) the manner in which GF's bills to RMP had been processed and submitted; and (iii) RMP's payments to date.  *Id.* at *6-7.  Before issuing his conclusions of law, Judge Bernstein summarized RMP's objections, several of which are repeated in this appeal:

> [RMP] contends that the entire claim should be denied in full based on *in pari delicto* and collateral estoppel.  It also maintains that [RMP] cannot be charged for the fees attributable to GF's representation of Meyer or computer legal research, GF's time entries are lumped or block-billed, a portion of its services were unreasonable or unnecessary, including Ellen August's time on the Arbitration and bankruptcy consultations on April 28, 29, 30, June 20, 26, July 17, August 4, 5 and 6 2008.  [RMP] also contends that the Merida bills are entitled to the "missing witness presumption."

*Id.* at *7.

The Bankruptcy Court then proceeded to analyze New York law on issue preclusion and the *in pari delicto* defense.  *Ridgemour IV*, 2018 WL 2305765, at *8-11.  Reviewing first RMP's broader argument that the trial court's dismissal

of the Malpractice Action collaterally estopped GF from recovering on its claim,

Judge Bernstein noted salient differences between the two litigations:

> The state court did not review or rule on any of the services rendered by GF prior to late June 2008; those services were irrelevant to the Malpractice Action and its decision. The Malpractice Action asserted claims based on the filing of the deeds and the cover up. The parties did not litigate and the state court did not decide whether the services GF rendered in connection with the Arbitration prior to late June 2008 were dishonest or unreasonable or unnecessary, and collateral estoppel does not preclude the Court from deciding whether GF's fees, particularly those relating to services before the recordation of the deeds, were unreasonable or unnecessary.

*Id.* at *8.

Turning next to RMP's narrower argument that the decision granting summary judgment in the Malpractice Action precluded recovery by GF under a theory of *in pari delicto*, the Bankruptcy Court was equally skeptical. The Court offered the preliminary observation that "[t]he doctrine of *in pari delicto* is more limited in contract disputes." *Ridgemour IV*, 2018 WL 2305765, at *8 (collecting cases). Then, echoing his tentative conclusions from the July 13 hearing, Judge Bernstein found that New York law "denies 'awards for the corrupt performance of contracts even though in essence the contracts are not illegal'" — so long as the corrupt performance "[went] to the heart of the plaintiff's claim." *Id.* (first citation to *McConnell* v. *Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 470, 471 (1960)). Conversely, New York courts building on *McConnell* have concluded that

> An agreement which is "lawful on its face and which does not contemplate or necessarily entail unlawful

conduct in its performance is enforceable by the promisee even though he engages in unlawful activity in the agreement's performance," provided the promisee does not require the aid of the illegal transaction to make out his case.

*Hilgendorff* v. *Hilgendorff*, 660 N.Y.S.2d 150, 151 (2d Dep't 1997) (internal citations omitted), *quoted in Ridgemour IV*, 2018 WL 2305765, at *9 (collecting cases).

Examining the evidence adduced at trial in light of that law, the Bankruptcy Court concluded that "GF incurred unpaid fees pursuant to an enforceable retainer agreement for legal services *which did not contemplate any wrongful conduct.* Accordingly, *in pari delicto* does not bar the recovery of fees that accrued prior to GF's improper acts." *Ridgemour IV*, 2018 WL 2305765, at *9 (emphasis added). Furthermore, GF had conceded that "the issue of whether [GF] engaged in immoral conduct is *res judicata.*" (Bankr. Dkt. #371). What remained, therefore, was for the Bankruptcy Court to "[fix] the precise moment when the fee claim should be cut off based on GF's immoral acts." *Id.* at *9. After reviewing the sequence of events surrounding the arbitration, and the contemporaneous communications between and among clients, counsel, and arbitrator, Judge Bernstein concluded that "the failure to disclose the recordation of the deeds to the Arbitrator or GDC on July 22, 2008, and the affirmative efforts to keep it a secret until GDC discovered the transfers on its own call for the denial of all fees incurred after July 21, 2008." *Id.* at *10; *see also id.* n.10 ("Through July 21, 2008, GF's accrued unpaid fees and expenses relating to the Arbitration matter totaled $182,993.31.").

The Bankruptcy Court then considered GF's fees relating to the Merida litigation. Considering each of RMP's arguments seriatim, it found on the record before it that: (i) RMP had in fact retained GF to represent it in the litigation, despite the absence of a separate retention letter; (ii) there was no evidence to support a claim of fabricated bills, and thus no need for GF to produce a witness to explain billing for the Merida matter; (iii) in spite of Meyer's testimony to the contrary, which the Court found to be incredible, "the services related to the Merida matter were performed for [RMP] or for the mutual benefit of Meyer and [RMP]." *Ridgemour IV*, 2018 WL 2305765, at *12.

For the next 20 or so pages, the Bankruptcy Court analyzed the reasonableness of GF's fees and expenses. It rejected various claims of excessiveness advanced by RMP; in addition to picking apart the factual bases for each claim, the Court observed that RMP had paid several months' worth of GF invoices with neither a complaint of excessiveness nor a claim for credit or reservation of rights. *Ridgemour IV*, 2018 WL 2305765, at *15; *see also id.* ("Moreover, many of their criticisms mischaracterize the time records by summarizing or omitting services, making it seem that the attorney did less work than the time entries reflect."). The Court also rejected an argument that an across-the-board reduction was warranted because GF often block-billed entries: "Furthermore, while GF attorneys often block billed their time on any given day, the details of the services identified in the time entries, amplified by Carbone's and August's trial testimony, allow the Court to determine the precise task reflected in each time entry and make an overall assessment

27

whether the aggregate time reflected was reasonable given the nature of the work and the representation." *Id.* at *18.  And the Court allowed GF to recover the majority of its legal research costs.  *Id.* at *18-19.  All told, Judge Bernstein allowed the claim to the extent of $259,606.71, along with post-petition interest.  *Id.* at *21.

### 5.    The Instant Appeal

RMP filed a notice of appeal on May 26, 2018.  (Bankr. Dkt. #398). Pursuant to the scheduling order issued by this Court (Dkt. #4), RMP filed its Appellant's Brief on July 11, 2018 (Dkt. #10); GF filed its Appellee's Brief on August 10, 2018 (Dkt. #12); and RMP filed its Reply Brief on August 22, 2018 (Dkt. #13).

## DISCUSSION

### A.    The Standard of Review

Under 28 U.S.C. § 158(a), district courts have jurisdiction to hear appeals from "final judgments, orders, and decrees" of bankruptcy courts.  A district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  Fed. R. Bankr. P. 8013.  "A district court reviews a bankruptcy court's findings of fact for clear error and reviews its legal conclusions de novo."  *Davidson* v. *AMR Corp. (In re AMR Corp.)*, 566 B.R. 657, 663 (S.D.N.Y. 2017) (citation omitted); *see also In re Charter Commc'ns, Inc.*, 691 F.3d 476, 482-83 (2d Cir. 2012) ("Generally in bankruptcy appeals, the district court reviews the bankruptcy

court's factual findings for clear error and its conclusions of law *de novo*." (citing Fed. R. Bankr. P. 8013)).

"Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous," *In re Artha Mgmt., Inc.*, 91 F.3d 326, 328 (2d Cir. 1996), and "due regard shall be given to the opportunity of the bankruptcy court to judge credibility of the witnesses," *In re Lafayette Hotel P'ship*, 227 B.R. 445, 448 (S.D.N.Y. 1998). *See also In re Margulies*, 517 B.R. 441, 451 (S.D.N.Y. 2014). Under the clear error standard, "[t]here is a strong presumption in favor of a trial court's findings of fact if supported by substantial evidence," and a reviewing court will not upset a factual finding "unless [it is] left with the definite and firm conviction that a mistake has been made." *Travelers Int'l A.G.* v. *Trans World Airlines, Inc.*, 41 F.3d 1570, 1574 (2d Cir. 1994) (first alteration in original) (quotation marks omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 1574-75 (citation and quotation marks omitted); *accord Adler* v. *Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*, 855 F.3d 459, 469 (2d Cir. 2017); *UFCW Local One Pension Fund* v. *Enivel Props., LLC*, 791 F.3d 369, 372 (2d Cir. 2015); *In re CBI Holding Co., Inc.*, 419 B.R. 553, 563 (S.D.N.Y. 2009) ("In reviewing findings for clear error, an appellate court is not allowed to second-guess the trial court's choice between competing inferences. Even if the appellate court might have weighed the evidence differently, it may not overturn findings that are not clearly erroneous." (alterations and internal quotation marks omitted)).

**B.  Analysis**

**1.  Overview**

No party to this appeal protests the Bankruptcy Court's finding that both RMP and Carbone engaged in misconduct in connection with the Arbitration. RMP embraces that finding in the instant appeal, believing that it has preclusive effect on GF's present claim for attorneys' fees.  Put more colloquially, RMP believes that what was good for the goose in the state court (namely, the grant of summary judgment against it in the Malpractice Action) must, both by law and equity, be good for the gander in this Court (namely, the dismissal of GF's claim for legal fees).  GF, for its part, had previously contested the Bankruptcy Court's findings, but now acknowledges that the finding of misconduct may not be relitigated.

What is more, no party to this appeal argues that GF's representation of RMP was tainted from the start, or that it was conceived with a mutual goal of deceiving GDC, the Arbitrator, or the Bankruptcy Court.  To the contrary, all of the evidence in the case indicates — and all of the decisions issued thus far have concluded — that it was late in the representation, after the Arbitrator's decisions of June 18 and 28, 2008, that GF either colluded with, or aided and abetted, RMP in recording the deeds and in keeping that information from GDC and the Arbitrator.  *See, e.g.*, *Ridgemour I*, 413 B.R. at 108 ("GDC demonstrated by clear and convincing evidence that the debtor, its principals and its attorneys acted dishonestly *when they secretly transferred the Property from Pinnacle to the debtor, and then hid what they had done from GDC and the*

30

*arbitrator*." (emphasis added)); *Ridgemour II*, 2013 WL 5574533, at *7 ("Based on the foregoing, despite Plaintiffs' contention to the contrary, they (including RMP, RDC and Rotonde), as well as Defendants (who now reluctantly acknowledge wrongdoing on their part), were both found to have acted dishonestly *in connection with the Property transfer and the subsequent coverup*." (emphasis added)).

This attention to chronology is significant. Before the Bankruptcy Court, the parties focused on relative culpability, with GF maintaining (with considerable record support) that RMP was the first-in-time or principal wrongdoer. However, the Bankruptcy Court correctly identified the relevant issue as one of timing — that unless GF's misconduct went to the heart of the representation, it and Carbone would be entitled to fees incurred before its joint misconduct with RMP took place. This determination accords with New York law; it is not subject to preclusion or estoppel; and the date determined by the Bankruptcy Court as the date on which GF was *in pari delicto* with RMP was not erroneous, much less clearly so. Conversely, RMP overstates the prior decisions of the Bankruptcy Court and New York State courts, as well as the prior positions of the parties. For all of these reasons, the Bankruptcy Court's order is affirmed.

### 2. The Bankruptcy Court Accurately Stated New York Law

#### a. Applicable Law

The Bankruptcy Court agreed with the parties that New York law governed the preclusive effect of the state court judgment dismissing the

Malpractice Action. *See Ridgemour IV*, 2018 WL 2305765, at *8 (collecting cases); *see FIA Leveraged Fund Ltd.* v. *Grant Thornton LLP*, 56 N.Y.S.3d 12, 18 (1st Dep't 2017) (noting that *in pari delicto* is a "substantive equitable defense," one that is governed by a contract's choice-of-law provisions and is "inextricably intertwined with the issues underlying the substantive claims brought by that party"); *see also In re ICP Strategic Credit Income Fund Ltd.*, 568 B.R. 596, 608 (S.D.N.Y. 2017) ("Indeed, courts typically apply New York law of *in pari delicto* after determining that New York law applies to the underlying claim to which the defense is asserted."), *aff'd sub nom. In re ICP Strategic Income Fund, Ltd.*, 730 F. App'x 78 (2d Cir. 2018) (summary order).

Under New York law, the *in pari delicto* doctrine "mandates that the courts will not intercede to resolve a dispute between two wrongdoers." *Kirschner* v. *KPMG LLP*, 15 N.Y.3d 446, 464 (2010).[12] More precisely, the defense "bars a party that has been injured as a result of its own intentional wrongdoing from recovering for those injuries from another party whose equal or lesser fault contributed to the loss." *In re Lehr Constr. Corp.*, 551 B.R. 732, 739 (S.D.N.Y. 2016) (quoting *Rosenbach* v. *Diversified Grp., Inc.*, 926 N.Y.S.2d 49, 51 (1st Dep't 2011)). The New York Court of Appeals has reasoned that "no court should be required to serve as paymaster of the wages of crime, or referee between thieves. Therefore, the law will not extend its aid to either of the

---

[12] The complete maxim is *in pari delicto potior est conditio defendentis*, which means "[i]n a case of equal or mutual fault, the position of the [defending party] is the better one." BLACK'S LAW DICTIONARY 806 (8th ed. 2004), *cited in Bateman Eichler, Hill Richards, Inc.* v. *Berner*, 472 U.S. 299, 306 (1985) (citing to earlier edition of dictionary).

parties or listen to their complaints against each other, but will leave them where their own acts have placed them" *Stone* v. *Freeman*, 298 N.Y. 268, 271 (1948).[13]

The *in pari delicto* doctrine is rooted in "the idea that 'where parties are equally at fault, the defending party is in the stronger position.'" *Grubin* v. *Rattet (In re Food Mgmt. Grp., LLC)*, 380 B.R. 677, 693 (Bankr. S.D.N.Y. 2008) (quoting *Ross* v. *Bolton*, 904 F.2d 819, 824 (2d Cir. 1990)). More precisely, the doctrine focuses on "the plaintiff's participation in the same wrongdoing as the defendant." *Terlecky* v. *Hurd (In re Dublin Sec., Inc.)*, 133 F.3d 377, 380 (6th Cir. 1997) (quoting *Bubis* v. *Blanton*, 885 F.2d 317, 321 (6th Cir. 1989)); *see also Deangelis* v. *Corzine (In re MF Glob. Holdings Ltd. Inv. Litig.)*, 998 F. Supp.

---

[13]     The formulation under federal law is similar:

> The equitable defense of *in pari delicto*, which literally means "in equal fault," is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct. Traditionally, the defense was limited to situations where the plaintiff bore "at least substantially equal responsibility for his injury," and where the parties' culpability arose out of the same illegal act. Contemporary courts have expanded the defense's application to situations more closely analogous to those encompassed by the "unclean hands" doctrine, where the plaintiff has participated "in some of the same sort of wrongdoing" as the defendant.

*Pinter* v. *Dahl*, 486 U.S. 622, 632 (1988) (internal citations omitted); *see also Rep. of Iraq* v. *ABB AG*, 768 F.3d 145, 160 (2d Cir. 2014) ("The doctrine of *in pari delicto*, a term meaning 'of equal fault,' reflects the principle that a plaintiff who has participated in wrongdoing equally with another person may not recover from that other person damages resulting from the wrongdoing.").

Application of the doctrine requires the plaintiff to be "an active, voluntary participant in the unlawful activity that is the subject of the suit." *Pinter*, 486 U.S. at 636. A second "requirement for invocation of the doctrine of *in pari delicto* is that the plaintiff's wrongdoing be at least substantially equal to that of the defendant." *BrandAid Mktg. Corp.* v. *Biss*, 462 F.3d 216, 218 (2d Cir. 2006) (citing *Bateman Eichler*, 472 U.S. at 310-11; *Peltz* v. *SHB Commodities Inc.*, 115 F.3d 1082, 1090 (2d Cir. 1997); *Ross* v. *Bolton*, 904 F.2d 819, 824-25 (2d Cir. 1990)).

2d 157, 189 (S.D.N.Y. 2014). Its purpose is twofold: "First, denying judicial relief to an admitted wrongdoer deters illegality. Second, *in pari delicto* avoids entangling courts in disputes between wrongdoers." *Kirschner*, 15 N.Y.3d at 464; *see also id.* ("Indeed, the principle that a wrongdoer should not profit from his own misconduct is so strong in New York that we have said the defense applies even in difficult cases and should not be 'weakened by exceptions.'") (citing *McConnell* v. *Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 470 (1960) ("We are not working here with narrow questions of technical law. We are applying fundamental concepts of morality and fair dealing not to be weakened by exceptions.")).

Analytically separate from the doctrine of *in pari delicto* is the question of the enforceability of agreements that have been tainted by unlawful performance. As other courts in this Circuit have observed,

> New York law is clear that "[a]n agreement which is lawful on its face" "and which does not contemplate or necessarily entail unlawful conduct in its performance is enforceable by the promisee even though he engages in unlawful activity in the agreement's performance."

*ImagePoint, Inc.* v. *JPMorgan Chase Bank, Nat. Ass'n*, 27 F. Supp. 3d 494, 515 (S.D.N.Y. 2014) (report and recommendation) (quoting *Hilgendorff* v. *Hilgendorff*, 660 N.Y.S.2d 150, 151 (2d Dep't 1997), *objections overruled*, No. 12 Civ. 7183 (LAK) (GWG), 2014 WL 3891326 (S.D.N.Y. Aug. 8, 2014); *accord Globaltex Grp. Ltd.* v. *Trends Sportswear Ltd.*, No. 09 Civ. 0235 (JBW), 2010 WL 1633438, at *1 (E.D.N.Y. Apr. 21, 2010) ("The contract between Globaltex and defendants bears no impropriety on its face; the illegality arises in connection

with its performance in the passing of the merchandise through customs. It appears that the double invoicing was only indirectly related to the contract, rather than being 'central to or a dominant part of the plaintiff's whole course of conduct in performance of the contract.'" (citing *McConnell*, 7 N.Y.S.2d at 471)); *cf. Dodge* v. *Richmond*, 196 N.Y.S.2d 477, 488 (1st Dep't 1960) (concluding under New York law that a contract is unenforceable if it was made "with corruption and fraud contemplated as its purpose"), *aff'd*, 8 N.Y.2d 829 (1960); *see generally Korea Life Ins. Co.* v. *Morgan Guar. Tr. Co. of N.Y.*, 269 F. Supp. 2d 424, 441 (S.D.N.Y. 2003) (distinguishing *malum in se* from *malum prohibitum* agreements).

### b. Discussion

This case exists at the crossroads of the *in pari delicto* doctrine and the *Hilgendorff* line of agreement-enforceability cases. Complicating the legal analysis is the fact that many decisions in this area cite one branch of the case law or the other without meaningfully engaging with the area of overlap. *Compare, e.g., Prote Contracting Co.* v. *Bd. of Educ. of the City of New York*, 657 N.Y.S.2d 158, 164 (1st Dep't 1997) ("It is well settled that contracts, although legal in their inducement and capable of being performed in a legal manner, which have nonetheless been performed in an illegal manner, will not be enforced."), *with Hilgendorff*, 660 N.Y.S.2d at 151 (finding such agreements enforceable "provided the promisee does not require the aid of the illegal transaction to make out his case"). Complicating the factual analysis is the fact that, unlike most *in pari delicto* cases, where the misconduct was

contemplated from the start or cannot be disaggregated from the remainder of the conduct, the facts of this case divide easily into "before GF misconduct" and "GF misconduct" periods.

The Court begins its analysis with the seminal New York Court of Appeals decision in *McConnell* v. *Commonwealth Pictures Corp.*, 7 N.Y.2d 465 (1960). There, the plaintiff agreed with the defendant that if the plaintiff were able to enter into a contract with a third-party producer that gave the defendant distribution rights for certain motion pictures, the defendant would give the plaintiff $10,000 and a percentage of the defendant's gross receipts from the distribution of those pictures. *Id.* at 468. The plaintiff in fact obtained distribution rights for the defendant as contemplated by the contract, but did so by bribing a representative of the producer with the $10,000 initial payment the plaintiff had received from the defendant. The defendant refused to pay the percentage of receipts, and the plaintiff sued.

The trial and appellate courts concluded that "since the agreement sued upon between plaintiff and defendant was not in itself illegal, plaintiff's right to be paid for performing it could not be defeated by a showing that he had misconducted himself in carrying it out." *McConnell*, 7 N.Y.2d at 469. The Court of Appeals "t[ook] a different view," finding that "[p]roper and consistent application of a prime and long-settled public policy closes the doors of our courts to those who sue to collect the rewards of corruption." *Id.*

The Court of Appeals began with the settled proposition that "a party to an illegal contract cannot ask a court of law to help him carry out his illegal

object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose[.]" *McConnell*, 7 N.Y.2d at 469 (citing *Stone*, 298 N.Y. at 271).  It followed with similarly uncontroversial precepts that "[n[o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." (*Id.* (citing *Carr* v. *Hoy*, 2 N.Y.2d 185, 187 (1957))).

On the facts before it, the Court of Appeals refused to depart from these precedents, despite the plaintiff's arguments that the agreement at issue was not fundamentally illegal:  "We must either repudiate those statements of public policy or uphold these challenged defenses.  It is true that some of the leading decisions were in suits on intrinsically illegal contracts but the rule fails of its purpose unless it covers a case like the one at bar." *McConnell*, 7 N.Y.2d at 469-70 (citations omitted); *see also id.* at 470 ("We are not working here with narrow questions of technical law.  We are applying fundamental concepts of morality and fair dealing not to be weakened by exceptions.").  After all, the Court reasoned, what the plaintiff sought in that case was "the fruit of an admitted crime" *Id.* at 470.  In so concluding, the Court of Appeals relied on several earlier cases that had concluded that "whatever be the law in other jurisdictions, we in New York deny awards for the corrupt performance of contracts even though in essence the contracts are not illegal." *Id.* (collecting cases).

The *McConnell* Court made clear, however, the limits of its holding:

It is argued that a reversal here means that the doing of any small illegality in the performance of an otherwise lawful contract will deprive the doer of all rights, with the result that the other party will get a windfall and there will be great injustice. Our ruling does not go as far as that. It is not every minor wrongdoing in the course of contract performance that will insulate the other party from liability for work done or goods furnished. *There must at least be a direct connection between the illegal transaction and the obligation sued upon.* Connection is a matter of degree. Some illegalities are merely incidental to the contract sued on. We cannot now, any more than in our past decisions, announce what will be the results of all the kinds of corruption, minor and major, essential and peripheral. All we are doing here is labeling the conduct described in these defenses as gross corruption depriving plaintiff of all right of access to the courts of New York State. Consistent with public morality and settled public policy, *we hold that a party will be denied recovery even on a contract valid on its face, if it appears that he has resorted to gravely immoral and illegal conduct in accomplishing its performance.*

*McConnell*, 7 N.Y.2d at 471 (emphases added) (internal citations omitted); *see also id.* ("We point out that our holding is limited to cases in which the illegal performance of a contract originally valid takes the form of commercial bribery or similar conduct and in which the illegality is central to or a dominant part of the plaintiff's whole course of conduct in performance of the contract.").

The Court of Appeals reaffirmed this analysis in *Kirschner* v. *KPMG LLP*, 15 N.Y.3d 446 (2010), concluding ultimately that a corporation defrauded by its directors and officers could not recover from auditors who either participated in the fraud or negligently failed to detect it. *See id.* at 464 ("The justice of the *in pari delicto* rule is most obvious where a willful wrongdoer is suing someone who is alleged to be merely negligent. A criminal who is injured

committing a crime cannot sue the police officer or security guard who failed to stop him; the arsonist who is singed cannot sue the fire department. But, as the cases we have cited show, the principle also applies where both parties acted willfully.").

Ultimately this Court views the instant case, as the Bankruptcy Court did, as an exception to *McConnell*. In arriving at this conclusion, the Court does not focus on obvious factual distinctions with that case, such as the different nature of the contracts at issue, or the absence of commercial bribery in this case. Rather, the Court has considered (i) the "direct[ness of the] connection between the illegal transaction and the obligation sued upon" and (ii) the degree to which GF and Carbone "resorted to gravely immoral and illegal conduct in accomplishing its performance" *McConnell*, 7 N.Y.2d at 471.

What is unique about this case is that the contract at issue, the parties' retainer agreement, contemplated accretive conduct by GF over an extended period of time, rather than a single instance of conduct. As the record makes plain, at first GF discharged its contractual obligations properly, and only after receiving the Arbitrator's June 18 and 28 decisions — neither of which is alleged to be tainted by GF or RMP misconduct — did it jointly embark on a pattern of deception with RMP. What is equally unique, as this Court and the Bankruptcy Court have emphasized, is that the periods of GF *conduct* and GF *misconduct* under the retainer agreement can be disaggregated. As to the latter period, the connection is direct, the "conduct in accomplishing its performance" is egregious, and the agreement is acknowledged by all to be unenforceable. As

to the former period, the connection is not at all direct (inasmuch as the legal services for which GF now seeks fees are not directly or proximately connected to the later misconduct) and the legal services provided by GF were neither "gravely immoral" nor "illegal."

Finally, the Court does not perceive that allowing GF to recover its fees for the pre-misconduct period would violate the policy objectives identified by the New York Court of Appeals. As just noted, a substantial portion of the legal services provided by GF neither contemplated nor abetted the misconduct identified by the Bankruptcy Court. Moreover, the plaintiff in *McConnell* is far closer analytically to RMP than GF. That is, there is no sense that GF engaged in any of the misconduct identified by the Bankruptcy Court for its own gain, but rather to advance the interests of its client RMP. And further unlike the *McConnell* plaintiff, the fees sought by GF did not require the Bankruptcy Court to countenance "collect[ion of] the rewards of corruption." *McConnell*, 7 N.Y.2d at 469.[14]

Accordingly, the Court agrees with the Bankruptcy Court's decision to analyze GF's claim using the *Hilgendorff* line of cases, pursuant to which the court considers the totality of the parties' relationship in assessing the length, as well as the severity, of the alleged joint misconduct.

---

[14] The Court is also troubled by the extrapolation of *McConnell* to cover situations where professionals provide services for an extended period of time, but are foreclosed from recovery because of an instance of misconduct at the tail end of the relationship.

### 3. Neither Claim Nor Issue Preclusion Compel a Different Result

As a second line of attack, RMP contends that the Bankruptcy Court was compelled to deny GF's claim because the combination of (i) its prior finding in *Ridgemour I* that GF had "acted with dishonesty and deceit," and (ii) the state court's grant of summary judgment in *Ridgemour II* resulted in claim and/or issue preclusion with regard to GF's claim. As set forth in the remainder of this section, the Court disagrees.

### a. Applicable Law

Federal courts sitting in New York apply New York law to determine whether a state court judgment has preclusive effect on claims or issues. *See Anderson News, LLC* v. *Am. Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012) ("[I]n order to determine the preclusive effect of a state-court decision, a federal court must look to the law of that state and should not give the state-court decision any greater preclusive effect than the courts of that state would give it."); *see also Owens* v. *Treder*, 873 F.2d 604, 607 (2d Cir. 1989) ("The federal court must … apply the collateral estoppel rules of the state which rendered the judgment.").

"In New York, *res judicata*, or claim preclusion, bars successive litigation based upon the same transaction or series of connected transactions if: (i) there is a judgment on the merits rendered by a court of competent jurisdiction, and (ii) the party against whom the doctrine is invoked was a party to the previous action, or in privity with a party who was." *People ex rel. Spitzer* v. *Applied Card Sys., Inc.*, 11 N.Y.3d 105, 122 (2008) (citations omitted); *accord*

*Brown Media Corp.* v. *K&L Gates, LLP*, 854 F.3d 150, 157 (2d Cir. 2017) ("The doctrine of *res judicata*, or claim preclusion, holds that a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."). "Under New York's transactional approach to the rule, 'once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.'" *Josey* v. *Goord*, 9 N.Y.3d 386, 389-90 (2007) (quoting *O'Brien* v. *City of Syracuse*, 54 N.Y.2d 353, 357 (1981)).

"Issue preclusion, or collateral estoppel, ... applies not to claims or to causes of action as a whole but rather to issues[.]" *Proctor* v. *LeClaire*, 715 F.3d 401, 414 (2d Cir. 2013). "Under New York law, collateral estoppel bars claims where [i] the issue in question was actually and necessarily decided in a prior proceeding, and [ii] the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Abdelal* v. *Kelly*, 726 F. App'x 8, 11 (2d Cir. 2018) (summary order) (quoting *Colon* v. *Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995)).[15]

---

[15]    To the extent that RMP claims preclusive effect solely from the Bankruptcy Court's decision in *Ridgemour I*, federal law would govern. However, the legal standards are identical. *See Duane Reade, Inc.* v. *St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 195 (2d Cir. 2010) ("Under both New York law and federal law, the doctrine of *res judicata*, or claim preclusion, provides that '[a] final judgment on the merits of an action precludes the parties ... from relitigating issues that were or could have been raised in that action."); *Postlewaite* v. *McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003) ("Under either federal law or New York State law, collateral estoppel, or issue preclusion, bars the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding, regardless of whether the two suits are based on the same cause of action.").

### b. Discussion

The Court begins its preclusion analysis with three observations. *First*, there were certain claims of collateral estoppel, made by the parties in connection with GF's motion to reopen the bankruptcy case, that were not accepted by the Bankruptcy Court. For example, GF argued that summary judgment in the Malpractice Action meant that the Plan Proponents (which included RMP) were "barred from further challenging the allowed amount of the GF Claim under the doctrine of *res judicata*" — on the theory that RMP had had the opportunity to address, in the Malpractice Action, "any alleged disputes regarding [GF's] entitlement to its legal fees." (Bankr. Dkt. #302-1 at 7, 11). RMP responded that *res judicata* actually operated to preclude GF from reopening the bankruptcy case or persisting with its claim for fees, since GF could have counterclaimed regarding the viability and reasonableness of that claim in the state court. (Bankr. Dkt. #306 at 3-5). The Bankruptcy Court rejected both sides' arguments in *Ridgemour III*, 2016 WL 5395836, at *4-5. These arguments are not renewed on appeal, and this Court does not address them further.

*Second*, RMP's principal argument to this Court for preclusion (and, as discussed later, for judicial estoppel) posits that the state court's decision in *Ridgemour II* operated to foreclose RMP's claims of breach of contract arising from the retainer agreement. Acknowledging the failure of its state court efforts, RMP here seeks to make lemons into lemonade: It argues that when the state court granted the motion for summary judgment, it necessarily found

that the retainer agreement with GF was invalid, thereby rendering it improper for the Bankruptcy Court to award fees based on that same agreement. (*See, e.g.*, RMP Br. 8, 13 ("In this matter the bankruptcy court awarded GF attorney fees pursuant to a retainer agreement that was entirely rejected by the state court which, at the insistence of GF, applied the doctrine of *in pari delicto* against RMP."); *see also* RMP Reply 6). Significantly, however, as GF points out (*see* GF Opp. 4), this argument was not made to the Bankruptcy Court, and it has therefore been waived. *See In re Taneja*, No. 17 Civ. 5618 (ER), 2018 WL 1831853, at *2 (S.D.N.Y. Apr. 16, 2018) ("Any arguments not raised in the bankruptcy court are considered waived; unless such a waiver results in manifest injustice, the new arguments will not be considered on appeal." (citing *In re Lionel Corp.*, 29 F.3d 88, 92 (2d Cir. 1994); *In re Barquet Grp., Inc.*, 486 B.R. 68, 73 n.3 (S.D.N.Y. 2012))), *appeal dismissed*, No. 18-1225, 2018 WL 5309801 (2d Cir. Aug. 31, 2018). (*See, e.g.*, Bankr. Dkt. #377 (argument not made in RMP's Proposed Findings of Fact and Conclusions of Law), #334 (argument not made in RMP's Motion *in Limine*)).

Even were the retainer agreement not waived, it would be undermined by RMP's own statements to the Bankruptcy Court:

> *The Debtor's Objections are not subject to res judicata because the State Court Action was not a final judgment on the merits of those Objections, or of the Claim, as [GF] suggests. The judgment was only that the Debtor could not recover damages on its affirmative claims of malpractice and related causes of action. Merely because the Debtor was not entitled to damages does not mean that the legal fees sought by [GF] in the Claim*

> were reasonable within the scope of Section 502(b)(4) of
> the Code.
>
> Further, the Debtor's affirmative claims in the State
> Court Action were not "the same" as [GF's] previously
> asserted Claim for legal fees in the Bankruptcy Case.
> They might have been the same if [GF] had pursued
> them in that action, but it failed to do so.

(Bankr. Dkt. #306 at 3 (emphasis added) (internal citation omitted)).

*Third*, there is a circularity to certain of RMP's arguments on this point. The arguments focus on the relationship between the Bankruptcy Court's findings regarding RMP's and GF's deceit in *Ridgemour I* and the state court's decision granting summary judgment in *Ridgemour II*. At base, RMP argues that the Bankruptcy Court's earlier decision in a different procedural context, because it was adopted by a state court judge in a related but separate litigation, operated to restrict the Bankruptcy Court's authority — and, indeed, foreclosed the Bankruptcy Court from deciding GF's claim. RMP is incorrect.

To begin, this Court finds that the Bankruptcy Court properly understood what it had, and had not, decided in 2008.[16] *Ridgemour I* addressed GDC's motion for the appointment of a Chapter 11 trustee; the relevant statute, 11 U.S.C. § 1104, "mandate[d] the appointment of a chapter 11 trustee 'for cause,' a term that expressly includes, but is not limited to, 'dishonesty.'" *Ridgemour I*, 413 B.R. at 108. But while the Court did find that

---

[16] The Court rejects RMP's claim that the Bankruptcy Court forgot its prior decision in *Ridgemour I*. (*See* RMP Br. 15-16 ("By awarding GF attorney fees in this matter the court is stating that its own pronouncements in [*Ridgemour I*], which were relied upon by state court in [*Ridgemour II*] should be ignored and that GF should nevertheless be rewarded for its wrongdoing. This was error.")).

"the debtor, its principal, Rotonde, and its lawyer, Carbone, acted dishonestly," *id.* at 112, what mattered for purposes of the motion was the conduct of the debtor's principal, Rotonde. The Bankruptcy Court found that "[f]or the reasons already discussed, I find that Rotonde is not a trustworthy fiduciary," and it is *that* well-substantiated finding that was the basis for the appointment of a trustee. *See id.* at 113-14.

The Bankruptcy Court's analysis of the preclusive effect *vel non* of the state court decision in *Ridgemour II* was equally correct. As noted, once the bankruptcy was reopened, the parties had argued that their respective adversaries were foreclosed even from raising a claim or a defense in that proceeding. Judge Bernstein correctly found that (i) the state court had not opined on the viability or reasonableness of GF's fees and expenses; (ii) GF had a permissive counterclaim for fees that it was not obligated to bring in state court; and (iii) determination of GF's claim was solely the province of the Bankruptcy Court. *Ridgemour III*, 2016 WL 5395836, at *4-5.

Further, in connection with the decision from which the instant appeal is taken, Judge Bernstein accurately identified the scope of the factual issues committed to the state court:

> The state court did not review or rule on any of the services rendered by GF prior to late June 2008; those services were irrelevant to the Malpractice Action and its decision. The Malpractice Action asserted claims based on the filing of the deeds and the cover up. The parties did not litigate and the state court did not decide whether the services GF rendered in connection with the Arbitration prior to late June 2008 were dishonest or unreasonable or unnecessary, and collateral estoppel

> does not preclude the Court from deciding whether GF's fees, particularly those relating to services before the recordation of the deeds, were unreasonable or unnecessary.

*Ridgemour IV*, 2018 WL 2305765, at *8. This Court has reviewed the state court's decision and agrees with Judge Bernstein's preclusion analysis.

It is true that the state court adopted the Bankruptcy Court's findings regarding misconduct on the part of Rotonde and Carbone. *Ridgemour II*, 2013 WL 5574533, at *7-8. It is also true that the state court found both parties in the Malpractice Action to be "wrongdoers," and thus *in pari delicto*. *Id.* Significantly, however, the claims in the Malpractice Action were almost exclusively focused on the precise period of time in which Judge Bernstein had found the misconduct to have occurred. *See supra* at 13-15 (analyzing malpractice complaint). The state court made no effort comparable to Judge Bernstein's to distinguish periods of GF conduct and GF misconduct in the representation, nor was it required to. Before the state court, RMP proffered the non-starter argument that "*in pari delicto* only applies to cases involving outright criminal acts." *Ridgemour II*, 2013 WL 5574533, at *9. RMP also sought support from the Westchester Action but, as the state court pointed out, the Westchester court had denied GF's motion for summary judgment on a claim of aiding and abetting a breach of fiduciary duty, effectively finding the "primary violator" to be RMP. *Id.* at *10. Finally, RMP made a halfhearted advice of counsel defense, which the state court rejected as "mitigated or discredited by their own exhibits they rely upon for support." *Id.*

In sum, this Court agrees with the Bankruptcy Court's preclusion analysis. Issue preclusion applies to the Bankruptcy Court's finding that RMP and GF had acted dishonestly in causing the transfer of the Property and in misrepresenting or omitting the fact of that transfer in communications with GDC and the Arbitrator. However, neither issue nor claim preclusion barred Judge Bernstein from ascertaining whether that misconduct operated as a partial or a complete bar to GF's recovery of legal fees, nor did it prevent him from determining the amount of fees to which GF was ultimately entitled under the Bankruptcy Code.

### 4.     Judicial Estoppel Does Not Bar GF's Claim

Relatedly, RMP contends that GF's statements to the Bankruptcy Court were inconsistent with statements made to the state court in the Malpractice Action and, more pointedly, that GF's espousal of *in pari delicto* arguments to the state court foreclosed recovery on its claim in the Bankruptcy Court. (*See* RMP Br. 12-13, 15-16; RMP Reply 5-6). Again, this Court disagrees.

### a.     Applicable Law

"New York follows the doctrine of judicial estoppel, whereby 'a party who assumes a certain position in a prior legal proceeding and secures a favorable judgment therein is precluded from assuming a contrary position in another action simply because his or her interests have changed.'" *Molina* v. *Faust Goetz Schenker & Blee, LLP*, 230 F. Supp. 3d 279, 283 (S.D.N.Y. 2017) (citing *Brooke S.B.* v. *Elizabeth A.C.C.*, 28 N.Y.3d 1, 17 (2016) (internal quotation marks omitted)). While the doctrine is not susceptible of a precise definition,

the Supreme Court has offered, and the New York Court of Appeals has cited approvingly, certain factors to consider.

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position.... A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Zedner* v. *United States*, 547 U.S. 489, 504 (2006) (quoting *New Hampshire* v. *Maine*, 532 U.S. 742, 749 (2001)).[17]

### b.    Discussion

Again, the Court begins by noting what it does not consider. The Court will not consider RMP's newly-minted claim that GF's successful summary judgment motion in the Malpractice Action estops it from now seeking any recovery based on the retainer agreement, since that argument has been waived. The Court will also not consider the collateral estoppel claims that each side made in connection with the reopening of the case, since *Ridgemour III* makes plain that neither side was successful in persuading the Bankruptcy Court to accept them.

The Court has compared the arguments made to the state court in the Malpractice Action and those made to the Bankruptcy Court after the case was reopened in 2016. Put simply, it sees no inconsistencies that amount to

---

[17]    The federal formulation is identical. *See BPP Illinois, LLC* v. *Royal Bank of Scotland Grp. PLC*, 859 F.3d 188, 192 (2d Cir. 2017); *see also Maharaj* v. *Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) (concluding that "federal and New York principles of *res judicata* and judicial estoppel lead ... to the same result").

judicial estoppel.  Before the state court, GF did not concede, but merely accepted for purposes of the cross-motions, the Bankruptcy Court's findings of misconduct, which GF correctly noted encompassed RMP misconduct as well. That is, GF accepted RMP's claims of misconduct and argued for dismissal of the Malpractice Action nonetheless on a theory that all of RMP's claims were subject to a defense of *in pari delicto*; GF did not discuss the viability, or the amount, of its own claim for legal fees.

The conduct underlying the state court's decision in the Malpractice Action and that underlying GF's claim for fees are not co-extensive — not only because the conduct cited by the state court was more concentrated in time and scope, but because that very conduct was excluded by the Bankruptcy Court from its ultimate determination of GF's fees.  Before the Bankruptcy Court, the parties focused more on their culpability relative to each other, and not on whether GF's representation could be divided into conduct for which the fees were recoverable under the Bankruptcy Code and misconduct for which the fees were not recoverable under the Code or the common law.  As such, there is no basis to find judicial estoppel.

### 5. The Bankruptcy Court Did Not Clearly Err in Determining the Fees to Which GF Was Entitled

Having addressed RMP's "home run" arguments, each of which sought wholesale denial of GF's claim, the Court now turns to RMP's "singles" argument, which focuses on whether Judge Bernstein correctly determined the amount of GF's claim.  This argument, in turn, reduces to a challenge to the date the Bankruptcy Court found GF and Carbone to be acting *in pari delicto*

with Rotonde and RMP. Here, the standard of review is one of clear error. The Court finds no such error.

After carefully considering various permutations of the parties' claim-determination arguments — presented in motions to reopen the bankruptcy case, to disallow GF's claim, and to admit (or preclude) evidence about the legal fees incurred in connection with the claim — Judge Bernstein took four days of testimony on the issue, from witnesses with firsthand knowledge of the fees incurred and the services performed. He admitted and reviewed numerous exhibits that were contemporaneously prepared to substantiate the charges. He considered this evidence in light of undisputed legal standards regarding the assessment of attorneys' fees and expenses. *Ridgemour IV*, 2018 WL 2305765, at *12-13.

With respect to specific factual findings, the Bankruptcy Court began by determining the dates for which GF could properly recover fees. Most of the factual analysis of *Ridgemour IV* concerns this point, and after evaluating all of the evidence, the Bankruptcy Court found that "the failure to disclose the recordation of the deeds to the Arbitrator or GDC on July 22, 2008, and the affirmative efforts to keep it a secret until GDC discovered the transfers on its own call for the denial of all fees incurred after July 21, 2008." *Ridgemour IV*, 2018 WL 2305765, at *10. Thereafter, the Court addressed specific challenges to GF's substantiation of its fees:

> Ridgemour has not challenged GF's billing rates (other than the fact that they were raised without express notice) and based on the Court's experience, they are certainly reasonable. ... Furthermore, Ridgemour has

51

> not challenged the time entries as vague in the sense that it could not determine what services were provided. ... Instead, Ridgemour contends that it is unreasonable to charge the Debtor for (1) Ellen August's attendance at the twelve arbitration days, (2) the bankruptcy consultations in April, June, July and August, 2008, and (3) the cost of the LEXIS and Westlaw computer time. ... In addition, Ridgemour argues that GF block-billed its time.

*Id.* at *13.[18]  Judge Bernstein considered, and rejected, each of these challenges, and concluded that GF's claim was allowed in the amount of $259,606.71.  *Id.* at *21.

On appeal, RMP raises two challenges to the amount of fees: it disputes the date of July 21, 2008, as the date after which GF was no longer entitled to fees, and it disputes the inclusion of fees related to services provided by GF in connection with the Merida litigation.  (RMP Br. 14-15, 17-18).  Both challenges fail.

Judge Bernstein has been involved with these parties (with varying degrees of intensity, to be sure) since August 2008; he had near-contemporaneous involvement with the underlying facts and conducted two different evidentiary hearings regarding GF's conduct in the Arbitration.  After evaluating the credibility of the witnesses and the available documentary evidence, Judge Bernstein concluded that July 21, 2008, was the relevant date.

---

[18]     The first of these issues was described by Judge Bernstein to be "part of the more general contention that the bills were excessive."  *Ridgemour IV*, 2018 WL 2305765, at *6.  Judge Bernstein reviewed each sub-contention in this category and rejected them all.  *Id.* at *12-16.

This Court agrees, and rather than summarize Judge Bernstein's findings, it presents them in full to evince the care that he took in arriving at his decision:

> Fixing a precise moment when the fee claim should be cut off based on GF's immoral acts is something that no court has had to determine until now. It requires consideration of all of the facts adduced at the trial on the Claim Objection. The state court referred to e-mails that Carbone received in late June discussing the filing of the deeds, but it was no secret that Ridgemour was anxious to file the deeds and proceed with the project. Furthermore, at least as of July 3, 2008, Carbone believed that the recordation of the deeds was tied to the completion of the mortgage documents. Carbone proposed to write to the Arbitrator on that day complaining that GDC was taking unreasonable positions regarding the mortgage documents in an attempt "to delay the transfer of the property to [Ridgemour]," GDC was "hoping to have the transfer of the properties delayed," and "[u]nder no circumstances should the conveyances of the properties be delayed until the conclusion of the damage hearing."

> The push to file the deeds without the mortgage in place revved up on July 16, 2008, a week after the issuance of the Interim Award. On July 16, 2008, Rotonde sent an email at 9:31 a.m. to Carbone and Robert Rattet, a bankruptcy lawyer, advising them that the deeds had been signed but had not been filed, and Ginsburg had created a "deadlock" regarding the mortgage and other documents and had asked the Arbitrator to intervene. Time entries on the following day indicate that Carbone participated in an inter-office conference, with a person identified as "TF," "Re Interim Order; transfer of deed," Carbone, Rotonde and Rattet spoke about "the Interim Award, Deeds, etc.", and Carbone, Rotonde and Meyer participated in a "conference call ... re same." Carbone testified that he told Rotonde not to do anything with the deeds and wait until the deeds, mortgages and other documents could be exchanged simultaneously. He said that filing the deeds would just give fuel to GDC to ask the Arbitrator to reverse the prior rulings that had been favorable to Ridgemour. Rattet, on the other hand, was encouraging Rotonde to file the deeds despite Carbone's adamant opposition. Rotonde disputed

Carbone's account, testifying that Carbone told him that the deeds could be recorded as soon as the Interim Award was entered.

The draft deeds were in the possession of Carol Dall, Ridgemour's attorney. On July 21, 2008, she delivered the deeds for recordation, Rotonde advised Carbone of that fact in an email the same day and asked Carbone to "call me at home if you can. I am at home." Carbone testified that he did not see Rotonde's email and first learned that the deeds had been delivered for recordation on July 22, 2008, after a conference call that day with the Arbitrator. However, Rotonde's email was sent at 8:41 a.m. on July 21, 2008, and Carbone's time records for July 21, 2008, included entries for "conference call with AJ[Rotonde]/Carol [Dall] re: response to Scarola [the Arbitrator]; telephone conference with AB [apparently Aaron Boyajian, a GF real estate partner] re: same; further multiple telephone conferences with AJ re: same." While there were many issues to discuss, it is difficult to believe that the delivery of the deeds for recordation was never mentioned. Yet during the conference call the next day with the Arbitrator and GDC's attorneys, Carbone did not advise anyone that the deeds were about to be recorded or had been recorded.

In fact, other near contemporaneous evidence indicates efforts to cover it up. On July 25, 2008, Ellen August sent an email to Rotonde and Meyer, with a copy to Carbone, reminding them "Merida should not be privy to anything that is happening now with regard to the transfer of the properties because we don't want Scott Wyner to relay any information to Brad Schwartz or Vuotto." Wyner represented Merida, Schwartz represented Pinnacle and Vuotto represented GDC. August was not involved with the transfer of the Property, and was pretty sure she wasn't the person who thought of sending the email. Carbone was her boss, it is not credible that she would have sent the email without Carbone's knowledge and blessing, and August declined to say that she had not discussed it with him.

Accordingly, I find that the failure to disclose the recordation of the deeds to the Arbitrator or GDC on

> July 22, 2008, and the affirmative efforts to keep it a
> secret until GDC discovered the transfers on its own call
> for the denial of all fees incurred after July 21, 2008.
> This conclusion is also consistent with Ridgemour's
> contention that GF did not do anything improper until
> July 21, 2008, when [Carbone] didn't tell anyone the
> deeds had been recorded and continued to negotiate.

*Ridgemour IV*, 2018 WL 2305765, at *9-10. There is no error in the

Bankruptcy Court's thorough evaluation of the evidence, and to the extent it

differs from the state court's recitation of same, this Court aligns itself with the

Bankruptcy Court.

Finally, RMP mounts a cursory challenge to the Bankruptcy Court's

allowance of fees for GF's work in the Merida litigation. (*See* RMP Br. 17-18).

The challenge merits swift rejection. Judge Bernstein had abundant evidence

to permit the conclusion that GF's work on Merida was within the scope of the

retainer agreement, *see Ridgemour IV*, 2018 WL 2305765, at *6, 11-12, and

this Court will not disturb that finding. Conversely, this Court finds no

evidence to support RMP's rumination that "Merida as a separate billing was

created to avoid the strictures of *in pari delicto* which appeared for the first time

after a hearing in which the bankruptcy court found Carbone and Rotonde to

have acted together with dishonesty and deceit." (RMP Br. 18).

## CONCLUSION

For the reasons set forth above, the order of the Bankruptcy Court is

affirmed; the GF claim is allowed in the amount of $259,606.71; and RMP is

directed to pay that sum, plus post-petition interest, in accordance with the

Plan.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:  March 15, 2019
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge